**FILED**

**SEP 21 2011**

DAVID CREWS, CLERK
BY_____
Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.                                                    CRIMINAL NO. 2:11CR38

RAYMOND LAMONT SHOEMAKER,                18 U.S.C. § 371
a.k.a. "RAY SHOEMAKER,"                  18 U.S.C. § 666
EARNEST LEVI GARNER, JR                  18 U.S.C. § 1001
a.k.a. "LEE GARNER," and                 18 U.S.C. § 1014
ROBERT S. CORKERN                        42 U.S.C. § 1320

## SUPERSEDING INDICTMENT

The Grand Jury Charges that:

### COUNT ONE
(Nursing Services Kickback/Bribery Conspiracy)
18 U.S.C. § 371

1.     From on or about May 2005, to on or about June 2007, in the Northern District of Mississippi, RAYMOND LAMONT SHOEMAKER, aka "RAY SHOEMAKER," defendant herein, being an agent of an organization, that is being the Chief Operating Officer and/or Chief Executive Officer of Tri-Lakes Medical Center (hereinafter "TLMC"), did knowingly and willfully conspire with defendant EARNEST LEVI GARNER, aka "LEE GARNER," David Chandler, who is not charged in this indictment, and other persons known and unknown to the grand jury, to commit an offense against the United States, i.e., to solicit, accept, offer and give anything of value for the purpose of influencing or being influenced in regard to any business, transaction or series of transactions of TLMC, which was a hospital located in Batesville, Mississippi, and which received during this time period benefits in excess of $10,000 per year under federal programs including Medicare and Medicaid, which business, transaction or series of transactions involved anything of value of $5,000 or more, in violation of Section 666 of Title 18 of the United States Code.

## Introduction

2.     TLMC was a hospital located in Batesville, Mississippi, which received in excess of $10,000 per year under federal programs including Medicare and Medicaid and as such, was an organization as set forth in 18 U.S.C. § 666. In May 2005, when this conspiracy began, TLMC was owned by Panola County and the City of Batesville. TLMC was subsequently sold to a private entity on or about November 15, 2005.

3.     At all relevant times, David Chandler (hereinafter "Chandler") was the Panola County Administrator and as such was an agent of a state or local government for purposes of 18 U.S.C. 666. During the relevant time period in which TLMC was owned by Panola County and the City of Batesville, Chandler was likewise the President of the Board of TLMC and as such, was an agent of the organization for purposes of 18 U.S.C. § 666. As President of the Board, Chandler had influence over the business transactions and contracts of TLMC.

4.     At all relevant times, defendant SHOEMAKER was the Chief Operating Officer and/or Chief Executive Officer of TLMC and therefore, like Chandler, was an agent of the organization for purposes of 18 U.S.C. § 666.

5.     At all relevant times, defendant LEE GARNER (hereinafter "GARNER") operated and controlled one or more nursing staffing companies, including Guardian Angel Nursing and On-Call Staffing, which were in the name of a family member.

6.     In or about February 2005, Guardian Angel Nursing entered into a contract with TLMC to provide nursing services for TLMC, for which Guardian Angel Nursing would be paid by TLMC an hourly rate for the nursing services provided. The value of this contract exceeded $5,000.

7.     TLMC was sold to a private entity on or about November 15, 2005, and shortly after that defendant SHOEMAKER's title changed from Chief Operating Officer (COO) to Chief Executive Officer (CEO) of TLMC. With the sale of TLMC, the board was replaced and Chandler lost his position as a member of the board, but continued as the County Administrator for Panola County.

**Manner and Means**

8.     It was part of the conspiracy that Defendant GARNER agreed to pay and would pay Chandler a kickback and bribe of $5 per hour for every hour of nursing services billed to TLMC by GARNER'S nursing services. In return for the bribes and kickbacks, Chandler, the President of the TLMC Board of Directors and the County Administrator, would use his influence to increase TLMC's use of GARNER'S nursing services, and would ensure that the bills submitted by defendant GARNER's nursing service would be paid in a timely manner by TLMC. In this manner, Chandler was rewarded for his influence in increasing billable hours and in securing payments of the bills as well as the timeliness of the payments. From on or about March 2005 to on or about July 2007, through Guardian Angel Nursing and On-Call Staffing, GARNER paid Chandler approximately $268,000 in kickbacks and bribes pursuant to the scheme.

9.     In furtherance of the conspiracy, Chandler acted as liaison between GARNER and SHOEMAKER and personally obtained and delivered TLMC checks to one of GARNER's employees. Chandler maintained a relationship with SHOEMAKER in order to influence SHOEMAKER with regard to GARNER'S nursing services, and as president of the TLMC board of directors, Chandler approved an increase of $50,000 in SHOEMAKER'S annual salary. Chandler arranged meetings between GARNER and SHOEMAKER in which the ongoing relationship between Guardian Angel Nursing and TLMC was discussed.

10. Around November 2005, GARNER, SHOEMAKER and Chandler met at a restaurant in Como, Mississippi. GARNER wanted to talk with SHOEMAKER about getting a greater share of TLMC nursing hours for GARNER's nursing service, and GARNER talked with SHOEMAKER alone during part of the meeting.

11. Shortly after the Como meeting, SHOEMAKER demanded payment of a promised bribe and kickback of $25,000 for increasing TLMC's use of GARNER'S nursing service. SHOEMAKER had upheld his part of the agreement with GARNER to increase TLMC's use of GARNER'S nursing service and he wanted GARNER to uphold his agreement to pay SHOEMAKER $25,000. Chandler informed GARNER of SHOEMAKER'S demand, and GARNER and Chandler agreed that Chandler would pay the bribe and kickback to SHOEMAKER out of the bribe money that GARNER was paying directly to Chandler. In accord with this agreement, from on or about January 27, 2006, to on or about July 27, 2006, Chandler paid defendant SHOEMAKER a total of $12,000, all of which was paid toward SHOEMAKER'S bribe and kickback demand for $25,000. Chandler also made the payments to SHOEMAKER to ensure that SHOEMAKER would maintain TLMC's use of GARNER'S nursing services.

12. As part of the coverup of the conspiracy, when SHOEMAKER was later confronted about the $12,000 he had received from Chandler, SHOEMAKER falsely claimed that the money was a loan, claiming that he had borrowed the money from Chandler.

### Overt Acts

13. During and in furtherance of the conspiracy and to effect the objects of the conspiracy, at least one of the co-conspirators committed at least one of the following overt acts on or about the dates listed:

(a) On May 25, 2005, Guardian Angel Nursing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $3,000.

(b)     On July 11, 2005, Guardian Angel Nursing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $15,000.

(c)     On September 2, 2005, Guardian Angel Nursing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $26,000.

(d)     On October 4, 2005, Guardian Angel Nursing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $12,000.

(e)     On December 23, 2005, Guardian Angel Nursing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $18,000.

(f)     On December 30, 2005, Guardian Angel Nursing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $28,000.

(g)     On January 27, 2006, defendant RAY SHOEMAKER received a check in the amount of $2,000 from David Chandler.

(h)     On February 22, 2006, Guardian Angel Nursing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $25,000.

(i)     On March 1, 2006, defendant RAY SHOEMAKER received a check in the amount of $2,000 from David Chandler.

(j)     On April 17, 2006, Guardian Angel Nursing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $20,000.

(k)     On April 17, 2006, defendant RAY SHOEMAKER received a check in the amount of $2,000 from David Chandler.

(l)     On May 23, 2006, defendant RAY SHOEMAKER received a check in the amount of $2,000 from David Chandler.

(m)     On June 2, 2006, Guardian Angel Nursing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $20,000.

(n)     On July 21, 2006, On-Call Staffing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $20,000.

(o)     On July 27, 2006, defendant RAY SHOEMAKER received a check in the amount of $4,000 from David Chandler.

(p)     On September 1, 2006, On-Call Staffing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $14,000.

(q)     On October 27, 2006, On-Call Staffing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $20,000.

(r)     On January 5, 2007, On-Call Staffing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $15,000.

(s)     On March 15, 2007, On-Call Staffing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $17,000.

(t)     On June 15, 2007, On-Call Staffing, under the supervision and direction of LEE GARNER, issued a check made payable to David Chandler in the amount of $15,000.

All in violation of Title 18, United States Code, Section 371.

### COUNT TWO
(Nursing Services Kickbacks and Bribes)
18 U.S.C. § 666

1.     The allegations contained in paragraphs 1 through 13 of Count One of this Indictment are re-alleged and incorporated herein.

2.     From on or about May 2005, to on or about June 2007, in the Northern District of Mississippi, EARNEST LEVI GARNER, JR, aka "LEE GARNER," defendant herein, did

knowingly, intentionally, and corruptly give, offer, and agree to give a thing of value, that is, money, with intent to influence or reward an agent of TLMC, an organization as set forth in 18 U.S.C. § 666, which received during this time period in excess of $10,000 per year in federal program benefits, including Medicare and Medicaid, and an agent of Panola County Mississippi, a State or local government, which received during this time period benefits in excess of $10,000 per year in federal program benefits, in connection with certain business, transaction or series of transactions of TLMC involving a thing of value of $5,000 or more, that is, the maintenance of a nursing contract between Guardian Angel Nursing and TLMC, the use of GARNER'S nursing services, Guardian Angel Nursing and On Call Staffing, and the timely payment of bills submitted by defendant GARNER's nursing service to TLMC, all in violation of Title 18, United States Code, Section 666.

## COUNT THREE
(Nursing Services Kickbacks and Bribes)
18 U.S.C. § 666

1.      The allegations contained in paragraphs 1 through 13 of Count One of this Indictment are re-alleged and incorporated herein.

2.      From on or about November 2005, to on or about June 2007, in the Northern District of Mississippi, RAYMOND LAMONT SHOEMAKER, aka "RAY SHOEMAKER," defendant herein, being an agent of an organization, that is being the Chief Operating Officer and/or Chief Executive Officer of TLMC, an organization which received during this time period in excess of $10,000 per year in federal program benefits, including Medicare and Medicaid, did knowingly, intentionally, and corruptly solicit, demand, accept, and agree to accept a thing of value, that is, money, intending to be influenced and rewarded in connection with certain business, transaction or series of transactions of TLMC involving a thing of value of $5,000 or more, that is, the use of nursing services provided by Guardian Angel Nursing and On Call Staffing, and the timely payment

of bills submitted by defendant GARNER's nursing service to TLMC, all in violation of Title 18, United States Code, Section 666.

## COUNT FOUR
(Healthcare Fraud Conspiracy)
18 U.S.C. § 371

1.     The allegations contained in paragraphs 1 through 13 of Count One of this Indictment are re-alleged and incorporated herein.

2.     From on or about November 2005, to on or about June 2007, in the Northern District of Mississippi, defendants RAYMOND LAMONT SHOEMAKER, aka "RAY SHOEMAKER," and EARNEST LEVI GARNER, aka "LEE GARNER," did knowingly and willfully conspire with each other, and David Chandler, who is not charged in this indictment, and other persons known and unknown to the grand jury, to commit an offense against the United States, i.e., to solicit, receive, offer and pay remuneration, that is, a kickback, bribe, or rebate, in return for, or for the purpose of, arranging for or recommending purchasing or ordering any service for which payment may be made in whole or in part under a Federal health care program, as described in Title 42, United States Code, Section 1320a-7b.

## Manner and Means

3.     The payments solicited, received, offered and paid by defendants SHOEMAKER and GARNER, and by Chandler, as described in paragraphs 8 through 13 of Count One and incorporated herein by reference, were for the purpose of influencing defendant SHOEMAKER to arrange for and recommend that TLMC purchase or order nursing services from GARNER's nursing service, including Guardian Angel Nursing and On-Call Staffing. The nursing services provided by GARNER's nursing service were paid for in whole or in part under Medicaid and Medicare, each of which is a Federal health care program as defined in 42 U.S.C. § 1320a-7b.

### Overt Acts

4. During and in furtherance of the conspiracy and to effect the objects of the conspiracy, at least one of the co-conspirators committed at least one of the following overt acts on or about the dates listed below:

(a) Between May 2005 and June 2007, defendant LEE GARNER paid David Chandler approximately $268,000 to influence TLMC, and SHOEMAKER in particular, to increase and maintain the use of GARNER'S nursing service, and from January 2006 through July 2006, Chandler used the some of the proceeds to generate payments directly to SHOEMAKER.

(b) On January 27, 2006, defendant RAY SHOEMAKER received a check in the amount of $2,000 from David Chandler.

(c) On March 1, 2006, defendant RAY SHOEMAKER received a check in the amount of $2,000 from David Chandler.

(d) On April 17, 2006, defendant RAY SHOEMAKER received a check in the amount of $2,000 from David Chandler.

(e) On May 23, 2006, defendant RAY SHOEMAKER received a check in the amount of $2,000 from David Chandler.

(f) On July 27, 2006, defendant RAY SHOEMAKER, received a check in the amount of $4,000 from David Chandler.

All in violation of Title 18, United States Code, Section 371 and Title 42, United States Code, Section 1320a-7b.

**COUNT FIVE**
(Healthcare Fraud)
42 U.S.C. § 1320a-7b)

1.      The allegations contained in paragraphs 1 through 13 of Count One of this Indictment and paragraphs 1 through 4 of Count Four of this Indictment are re-alleged and incorporated herein.

2.      From on or about November 2005 to on or about June 2007, in the Northern District of Mississippi, EARNEST LEVI GARNER, aka "LEE GARNER," defendant herein, did knowingly and willfully offer and pay remuneration, that is, a kickback, bribe, or rebate, to a person for the purpose of inducing that person to arrange for or recommend purchasing or ordering a service for which payment may be made in whole or in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b.

**COUNT SIX**
(Healthcare Fraud)
42 U.S.C. § 1320a-7b)

1.      The allegations contained in paragraphs 1 through 13 of Count One of this Indictment and paragraphs 1 through 4 of Count Four of this Indictment are re-alleged and incorporated herein.

2.      From on or about November 2005 to on or about June 2007, in the Northern District of Mississippi, RAYMOND LAMONT SHOEMAKER, aka "RAY SHOEMAKER," defendant herein, did knowingly and willfully solicit and receive remuneration, that is, a kickback, bribe, or rebate, in return for arranging for or recommending purchasing or ordering a service for which payment may be made in whole or in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b.

**COUNT SEVEN**
(False Statements)
18 U.S.C. § 1001

1.      The allegations contained in paragraphs 1 through 13 of Count One of this Indictment and paragraphs 1 through 4 of Count Four of this Indictment are re-alleged and incorporated herein.

2.      On or about October 22, 2009, and on or about March 4, 2010, in the Northern District of Mississippi, RAYMOND LAMONT SHOEMAKER, aka "RAY SHOEMAKER," defendant herein, in a matter within the executive branch of the Government of the United States, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations to Federal Bureau of Investigation (FBI) and other federal government agents in violation of Title 18, United States Code, Section 1001.

3.      Specifically, when questioned by federal agents on or about October 22, 2009, about the payments from David Chandler to defendant SHOEMAKER referenced in paragraphs 13 of Count One, defendant SHOEMAKER falsely stated that he had never received any money from Chandler.  When federal agents subsequently interviewed SHOEMAKER on or about March 4, 2010, and confronted him with copies of the checks given to him by Chandler, defendant SHOEMAKER falsely stated that he had borrowed the money from Chandler, when in truth and fact the checks SHOEMAKER received from Chandler were kickbacks for TLMC's use of Earnest Levi Garner's nursing service.  These statements constitute materially false, fictitious and fraudulent statements to federal law enforcement agents, made for the purpose of misleading the agents, in violation of Title 18, United States Code, Section 1001.

## COUNT EIGHT
(Conspiracy to Make False Statements to USDA)
18 U.S.C. § 371

### Introduction and Background

At all times relevant herein:

1. Defendant ROBERT CORKERN was a physician in Batesville, Mississippi and through management contracts with Tri-Lakes Medical Center (hereinafter "TLMC") and Physicians and Surgeons Hospital Group (hereinafter "PSHG"), was responsible for the overall management of TLMC.

2. Defendant RAYMOND LAMONT SHOEMAKER, aka "RAY SHOEMAKER," was the Chief Operating Officer and/or Chief Executive Officer of TLMC and, subsequently, PSHG.

3. David Vance was a consultant and personal representative of ROBERT CORKERN. David Vance represented CORKERN and PSHG in negotiating with lenders associated with the purchase and operation of TLMC. On or about June 6, 2005, ROBERT CORKERN personally entered into a consulting agreement with David Vance through Vance's consulting company, MTV Healthcare. The consulting agreement generated over $600,000 in consulting fees for David Vance.

4. On or about March 4, 2003, RAY SHOEMAKER created a Mississippi non-profit corporation named Kaizen Consulting Managing and Researching (CMR) (hereinafter "Kaizen CMR").

5. On or about June 3, 2005, ROBERT CORKERN personally entered into an agreement to purchase TLMC from the City of Batesville, Mississippi and Panola County, Mississippi, and the purchase agreeement required that ROBERT CORKERN place $500,000 in

escrow as an earnest money deposit. ROBERT CORKERN used $200,000 of TLMC funds, owned by Panola County and the City of Batesville at the time, as a portion of his $500,000 earnest money deposit and obtained the remaining $300,000 through a loan with First Security Bank in Batesville, Mississippi.

6. Around the same time ROBERT CORKERN agreed to purchase TLMC, he became aware that the United States Department of Agriculture (USDA) Rural Development Administration (RDA) might be able to guarantee 90% of a loan used to finance the purchase of the hospital, but only if the hospital was purchased by a non-profit organization. CORKERN did not have enough time to create a new non-profit to facilitate the purchase of TLMC so RAY SHOEMAKER offered his non-profit, Kaizen CMR, to function as the non-profit buyer of TLMC.

7. On or about June 3, 2005, a confidential agreement was prepared which provided that ROBERT CORKERN would purchase Kaizen CMR from RAY SHOEMAKER for $250,000 and on or about July 28, 2005, SHOEMAKER changed the name of his non-profit from Kaizen CMR to Physician and Surgeons Hospital Group ("PSHG"), thereby giving PSHG non-profit status.

8. On or about September 30, 2005, ROBERT CORKERN assigned his rights as the purchaser of TLMC to the non-profit entity PSHG, which was formerly known as Kaizen CMR.

9. On or about November 15, 2005, PSHG purchased TLMC from the City of Batesville and Panola County, Mississippi for approximately $27,325,000 and the hospital became known as PSHG d.b.a. TLMC (hereinafter "PSHG/TLMC").

10. In connection with the purchase of TLMC, PSHG borrowed $27,325,000 from UPS Capital Business Credit (hereinafter "UPS Capital") and Stillwater National Bank and Trust

Company (hereinafter "Stillwater"). The Rural Development Administration of the United States Department of Agriculture provided a guarantee for 90% of the $27,325,000 loan.

11. Prior to November 15, 2005, the USDA, UPS Capital and Stillwater determined that ROBERT CORKERN'S $500,000 earnest money deposit would be held in an interest reserve account until PSHG/TLMC had successfully made interest payments for three consecutive years on the $27,325,000 loan.

12. On or about November 15, 2005, Batesville Hospital Management, an entity owned by ROBERT CORKERN, entered into a contract with PSHG to "supervise and manage the day-to-day operations of the Hospital." The management contract effectively gave ROBERT CORKERN complete control of the hospital upon the closing of the sale to PSHG.

13. Shortly after PSHG purchased TLMC on November 15, 2005, RAY SHOEMAKER'S title changed from Chief Operating Officer (COO) to Chief Executive Officer (CEO) of PSHG/TLMC.

14. On or about November 15, 2005, in addition to the main $27,325,000 loan used to purchase TLMC, PSHG also secured a $2,100,000 line of credit from Stillwater for general working capital purposes in the operation of the hospital.

15. As early as December 2005, David Vance contacted the Healthcare Financial Services division of the General Electric Capital Corporation (hereinafter "GE Capital") on behalf of PSHG/TLMC and began seeking a larger, $4,000,000 line of credit to replace the $2,100,000 line of credit with Stillwater.

16. David Vance failed to disclose to GE Capital, UPS or the USDA that RAY SHOEMAKER and ROBERT CORKERN intended to use the funds from the larger $4,000,000 line of credit to pay ROBERT CORKERN $291,508.63 and RAY SHOEMAKER, through Kaizen CMR,

$250,000.

17.     On or about January 30, 2006, without the knowledge of ROBERT CORKERN'S and RAY SHOEMAKER'S true intention to use the proceeds of the line of credit for their own corrupt personal benefit, GE Capital provided a commitment letter, addressed to RAY SHOEMAKER as Chief Executive Officer of PSHG/TLMC, agreeing to provide PSHG/TLMC with a $4,000,000 line of credit "for working capital purposes, refinancing existing working capital indebtedness, and other corporate purposes to be determined."

18.     Without the knowledge of the true intentions of ROBERT CORKERN and RAY SHOEMAKER, UPS Capital had no objection to the new line of credit with GE Capital and approved same on or about January 26, 2006.

19.     The new, larger $4,000,000 line of credit would take a priority position ahead of the $27,325,000 loan backed by the USDA's 90% guarantee.  Thus, in the event of default on the loans, if any funds or assets were available to pay creditors, they would be applied to pay the GE loan before the USDA-guaranteed loan from UPS Capital. As a result, the $4,000,000 line of credit would weaken the USDA's position as 90% guarantor and required the USDA's approval before coming into effect.

20.     On or about March 2, 2006, the USDA denied PSHG's request for the $4,000,000 line of credit from GE Capital.

21.     On or about March 28, 2006, the USDA reversed its original decision and allowed PSHG to obtain the $4,000,000 line of credit from GE Capital.

22.     From on or about June 2005 to on or about April 2006, RAY SHOEMAKER and ROBERT CORKERN, defendants, did knowingly and willfully conspire with each other, David Vance, who is not charged in this Indictment, and others known and unknown to the Grand Jury

to commit an offense against the United States, that is, to knowingly make and cause to be made material, false statements and reports for the purpose of influencing the action of the Rural Development Administration of the United States Department of Agriculture, UPS Capital and GE Capital upon and in connection with the decision to allow Physicians and Surgeons Hospital Group to obtain a $4,000,000 line of credit from GE Capital in violation of Title 18, United States Code, Section 1014.

### Manner and Means

23.     It was part of the conspiracy that ROBERT CORKERN, through David Vance, and RAY SHOEMAKER misled the USDA, GE Capital and UPS Capital by representing that the proceeds of the $4,000,000 line of credit were essential to the day to day operations of PSHG/TLMC when in truth and in fact, CORKERN'S and SHOEMAKER'S true intention was to use the proceeds of the $4,000,000 line of credit to pay $291,508.63 to ROBERT CORKERN and $250,000 to RAY SHOEMAKER, through Kaizen CMR.

24.     It was part of the conspiracy that David Vance prepared a secret "Sources and Uses Statement" which provided that the proceeds of the line of credit from GE Capital would be used to pay as much as $500,000 to ROBERT CORKERN and $250,000 to RAY SHOEMAKER, through Kaizen CMR.

25.     It was part of the conspiracy that David Vance, acting as a representative of ROBERT CORKERN, RAY SHOEMAKER, and PSHG/TLMC, failed to disclose the secret Sources and Uses Statement while securing the approval of the $4,000,000 line of credit and negotiating the terms of the line of credit. The USDA, GE Capital and UPS Capital would not have approved the $4,000,000 line of credit if they had been aware that CORKERN and

SHOEMAKER intended to use the proceeds of the $4,000,000 line of credit to corruptly obtain over $500,000 for their own personal benefit.

26.     It was part of the conspiracy that RAY SHOEMAKER urged the USDA to approve the $4,000,000 line of credit and represented to the USDA that the line of credit was essential to the financial well-being of PSHG/TLMC.  However, RAY SHOEMAKER failed to disclose his and ROBERT CORKERN'S true intention to use the proceeds of the $4,000,000 line of credit for their own personal and corrupt benefit in accordance with the secret Sources and Uses Statement.

27.     It was part of the conspiracy that RAY SHOEMAKER, acting as a representative of PSHG/TLMC, falsely certified to GE Capital that the proceeds of the $4,000,000 line of credit would only be used for the benefit of PSHG/TLMC and failed to disclose CORKERN'S and SHOEMAKER'S true intention to use the proceeds of the $4,000,000 line of credit for their own personal and corrupt benefit in accordance with the secret Sources and Uses Statement.

**Overt Acts**

28.     During and in furtherance of the conspiracy and to effect the objects of the conspiracy, at least one of the co-conspirators committed at least one of the following overt acts on or about the dates listed:

(a)     On March 7, 2006, David Vance, acting as a representative of ROBERT CORKERN, RAY SHOEMAKER, and PSHG/TLMC, sent an e-mail to the USDA with an attached letter from RAY SHOEMAKER in response to the USDA's March 2, 2006 denial of the larger, $4,000,000 line of credit.  In his letter, SHOEMAKER pleaded with the USDA to reverse course and approve the $4,000,000 line of credit.  SHOEMAKER'S letter stated that without the $4,000,000 line of credit, "the future of the hospital is in jeopardy" and SHOEMAKER closed

the letter by stating "Please help us. Every day this decision is post-phoned puts the hospital in jeopardy"(spelling error in original). David Vance's email and SHOEMAKER'S attached letter failed to disclose SHOEMAKER'S and CORKERN'S true intention to use the proceeds of the $4,000,000 line of credit for their own personal and corrupt benefit in accordance with the secret Sources and Uses Statement that provided for a $250,000 payment to SHOEMAKER, through Kaizen CMR, and as much as a $500,000 payment to ROBERT CORKERN.

(b) Shortly before March 8, 2006, ROBERT CORKERN and RAY SHOEMAKER, through David Vance, responded to a number of concerns raised by the USDA regarding PSHG/TLMC's request for the larger, $4,000,000 line of credit. In responding to the concerns of the USDA, CORKERN and SHOEMAKER, through David Vance, failed to disclose their true intention to use the proceeds of the $4,000,000 line of credit for their own personal benefit in accordance with the secret Sources and Uses Statement.

(c) On March 31, 2006, RAY SHOEMAKER, as Chief Executive Officer of PSHG, signed a letter addressed to GE Capital that provided the bank account information for PSHG/TLMC and stated "I certify that the proceeds of this account shall be used exclusively for the benefit of [PSHG/TLMC], and shall not be used to pay any expenses of any affiliates of [PSHG/TLMC] or any other parties other than [PSHG/TLMC]." However, RAY SHOEMAKER and ROBERT CORKERN failed to disclose their true intention to use the proceeds of the $4,000,000 line of credit for their own personal and corrupt benefit in accordance with the secret Sources and Uses Statement.

(d) On April 7, 2006, RAY SHOEMAKER, as Chief Executive Officer of PSHG/TLMC, signed an Acknowledgement attached to the Intercreditor Agreement between UPS Capital and GE Capital which made the $4,000,000 line of credit available to PSHG/TLMC. SHOEMAKER failed to disclose that he and ROBERT CORKERN intended to use the proceeds of the $4,000,000 line of

credit for their own personal and corrupt benefit in accordance with the secret Sources and Uses Statement.

(e)     On April 7, 2006, RAY SHOEMAKER, as CEO of PSHG, signed a Payment of Proceeds Letter requesting the first disbursement from the new $4,000,000 line of credit and failed to disclose that he and ROBERT CORKERN intended to use the proceeds of the $4,000,000 line of credit for their own personal benefit in accordance with the secret Sources and Uses Statement.

(f)     On April 7, 2006, ROBERT CORKERN, as the "Manager" of PSHG/TLMC, signed the Loan and Security Agreement by and between PSHG/TLMC and GE Capital related to the $4,000,000 line of credit and failed to disclose his intention to use the proceeds of the line of credit to pay himself $291,508.63.

(g)     On April 7, 2006, ROBERT CORKERN signed the Certificate of Validity related to the $4,000,000 line of credit and failed to disclose his intention to use the proceeds of the line of credit to pay himself $291,508.63.

(h)     On April 7, 2006, RAY SHOEMAKER used his authority as Chief Executive Officer of PSHG/TLMC to cause PSHG/TLMC to issue a check in the amount of $250,000 payable to RAY SHOEMAKER'S company, Kaizen CMR. RAY SHOEMAKER deposited the $250,000 into a bank account with First Delta Credit Union in Marks, Mississippi for his own personal benefit and use.

(i)     On or about April 10, 2006, David Vance, acting on behalf of ROBERT CORKERN and with the approval of RAY SHOEMAKER, instructed PSHG/TLMC to wire $291,508.63 into the account of Emergent Health at Trustmark National Bank for the personal benefit of ROBERT CORKERN. On or about April 11, 2006, Emergent Health issued a check made payable to First Security Bank in the amount of $291,576.17 as payment for the $300,000 loan used by ROBERT

CORKERN in June 2005 as a portion of his $500,000 earnest money deposit with Panola County and the City of Batesville.

All in violation of Title 18, United States Code, Section 371.

### COUNT NINE
(False Statement to the USDA)
18 U.S.C. § 1014

1.      The allegations contained in paragraphs 1 through 28 of Count 8 of this Indictment are re-alleged and incorporated herein.

2.      On or about March 7, 2006, in the Northern District of Mississippi, RAY SHOEMAKER and ROBERT CORKERN, defendants, aided and abetted by each other, David Vance, who is not charged in this Indictment, and others known and unknown to the Grand Jury, did knowingly make and cause to be made material, false statements and reports for the purpose of influencing the action of the Rural Development Administration of the USDA upon and in connection with the USDA's decision to allow Physicians and Surgeons Hospital Group to obtain a $4,000,000 line of credit from GE Capital; that is, RAY SHOEMAKER, aided and abetted by ROBERT CORKERN and David Vance, submitted a letter to the USDA urging the USDA to approve PSHG/TLMC's request for a $4,000,000 line of credit from GE Capital, and in doing so, RAY SHOEMAKER failed to disclose to the USDA that SHOEMAKER and ROBERT CORKERN intended to use the proceeds of the $4,000,000 line of credit for their own personal benefit in accordance with the secret Sources and Uses Statement that provided for as much as a $500,000 payment to CORKERN and a $250,000 payment to SHOEMAKER, through Kaizen CMR, in violation of Title 18, United States Code, Sections 2 and 1014.

**COUNT TEN**
(False Statement to the USDA)
18 U.S.C. § 1014

1. The allegations contained in paragraphs 1 through 28 of Count 8 of this Indictment are re-alleged and incorporated herein.

2. On or about March 31, 2006, in the Northern District of Mississippi, RAY SHOEMAKER and ROBERT CORKERN, defendants, aided and abetted by each other, David Vance, who is not charged in this Indictment, and others known and unknown to the Grand Jury, did knowingly make and cause to be made material, false statements and reports for the purpose of influencing the action of Rural Development Administration of the USDA and GE Capital upon and in connection with the decision to extend a $4,000,000 line of credit to PSHG/TLMC; that is, RAY SHOEMAKER, acting as a representative of ROBERT CORKERN and PSHG/TLMC, signed a letter addressed to GE Capital that provided the bank account information for PSHG/TLMC and stated "I certify that the proceeds of this account shall be used exclusively for the benefit of [PSHG/TLMC], and shall not be used to pay any expenses of any affiliates of [PSHG/TLMC] or any other parties other than [PSHG/TLMC]," when in truth and in fact, RAY SHOEMAKER and ROBERT CORKERN intended to use the proceeds of the $4,000,000 line of credit for their own personal benefit in accordance with the secret Sources and Uses Statement that provided for as much as a $500,000 payment to CORKERN and a $250,000 payment to SHOEMAKER, through Kaizen CMR, in violation of Title 18, United States Code, Sections 2 and 1014.

**COUNT ELEVEN**
(False Statement to the USDA)
18 U.S.C. § 1014

1. The allegations contained in paragraphs 1 through 28 of Count 8 of this Indictment are re-alleged and incorporated herein.

2.     On or before March 8, 2006, in the Northern District of Mississippi, RAY SHOEMAKER and ROBERT CORKERN, defendants, aided and abetted by each other, David Vance, who is not charged in this Indictment, and others known and unknown to the Grand Jury, did knowingly make and cause to be made  material, false statements and reports for the purpose of influencing the action of the Rural Development Administration of the USDA and UPS Capital upon and in connection with the decision to allow PSHG/TLMC to obtain a $4,000,000 line of credit from GE Capital; that is, ROBERT CORKERN and RAY SHOEMAKER, through David Vance, responded to a number of concerns raised by the USDA regarding PSHG/TLMC's request for the larger, $4,000,000 line of credit and in doing so, failed to disclose their true intention to use the proceeds of the $4,000,000 line of credit for their own personal benefit in accordance with the secret Sources and Uses Statement that provided for as much as a $500,000 payment to CORKERN and a $250,000 payment to SHOEMAKER, through Kaizen CMR, in violation of Title 18, United States Code, Sections 2 and 1014.

## COUNT TWELVE
(Embezzlement of $250,000 from PSHG/TLMC)
18 U.S.C. § 666

1.     The allegations contained in paragraphs 1  through 28 of Count 8 of this Indictment are re-alleged and incorporated herein.

2.     On or about April 7, 2006, in the Northern District of Mississippi, RAYMOND LAMONT SHOEMAKER, aka "RAY SHOEMAKER," defendant herein, being an agent of an organization, that is, the Chief Executive Officer of PSHG/TLMC, which received in excess of $10,000 in the 2006 calendar year under a federal program of federal financial assistance, namely Medicare and Medicaid, did knowingly and intentionally embezzle, steal, obtain by fraud and otherwise without authority knowingly convert to his own use property of PSHG/TLMC valued at

$5,000 or more, to wit: RAY SHOEMAKER used his position and authority as Chief Executive Officer of PSHG/TLMC to cause PSHG/TLMC to issue a check in the amount of $250,000 payable to his company, Kaizen CMR, for his own personal benefit and use, all in violation of Title 18, United States Code, Section 666.

**COUNT THIRTEEN**
(Federal Program Bribery)
18 U.S.C. § 666

**Introduction and Background**

At all times relevant herein:

1.     The allegations contained in paragraphs 1 through 28 of Count 8 of this Indictment are re-alleged and incorporated herein.

2.     Panola County, Mississippi, was a local governmental political subdivision of the State of Mississippi.

3.     Panola County received benefits in excess of $10,000, in each one year period herein under a federal program of federal financial assistance.

4.     David Chandler was the County Administrator for Panola County, Mississippi and an agent of the County.

5.     PSHG/TLMC received benefits in excess of $10,000, in each one year period herein under a federal program of federal financial assistance.

6.     From on or about November 15, 2005 until PSHG/TLMC'S bankruptcy in August of 2007, PSHG/TLMC paid approximately $2.8 Million to entities controlled by ROBERT CORKERN.

7.     On or about January 16, 2007, the Mississippi Division of Medicaid began withholding all payments for all claims submitted by PSHG/TLMC. Medicaid payments were a

major source of revenue for PSHG/TLMC and the cessation of payments by Medicaid limited PSHG/TLMC'S ability to continue to make payments to ROBERT CORKERN'S various entities.

8.     Panola County, Mississippi maintained a bank account at First Security Bank in Batesville, Mississippi which contained $400,000 in funds related to Panola County's operation of TLMC prior to the November 15, 2005 sale to PSHG.

### The Bribery Scheme

9.     On or about March 28, 2007, in the Northern District of Mississippi, ROBERT CORKERN, defendant herein, aided and abetted by other persons known and unknown to the grand jury, did, knowingly and corruptly give, offer and agree to give an item of value, that is, money, in an amount greater than $5,000.00, to David Chandler, an agent of a local government, that is being the County Administrator for Panola County, Mississippi, which received federal program benefits in excess of $10,000.00 during the one-year calendar period of 2007, in an effort to obtain $400,000 in funds under the ownership and control of Panola County, Mississippi.

11.     On or about late 2006 or early 2007, ROBERT CORKERN contacted David Chandler, the County Administrator for Panola County, Mississippi, and requested that Panola County transfer the aforementioned $400,000 to PSHG/TLMC.

12.     Sometime prior to March 20, 2007, ROBERT CORKERN agreed to pay a bribe to David Chandler if Chandler would use his authority as Panola County Administrator to ensure that Panola County transferred the entire $400,000 to PSHG/TLMC without questioning whether PSHG/TLMC was actually entitled to the funds.

13.     On or about March 20, 2007, Panola County, according to David Chandler's

instructions, issued a check in the amount of $400,000 made payable to PSHG/TLMC.

14.     On or about March 28, 2007, ROBERT CORKERN, through his company, Batesville Hospital Management, issued a check made payable to David Chandler in the amount of $25,000. ROBERT CORKERN issued this $25,000 check as payment of his promised bribe to David Chandler for his role in ensuring that Panola County transferred the entire $400,000 to PSHG/TLMC without any objections or investigation into whether PSHG/TLMC was actually entitled to the money. But for the $25,000 payment from ROBERT CORKERN, David Chandler, as Panola County Administrator, would have asserted that PSHG/TLMC was not entitled to the entire $400,000 and that Panola County had a legal claim to retain at least a portion of the $400,000.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(2).

### COUNT FOURTEEN
(Embezzlement from Humphreys County Memorial Hospital)
18 U.S.C. § 666

1.     Using his position as the manager and administrator of Humphreys County Memorial Hospital, defendant RAYMOND LAMONT SHOEMAKER, aka "RAY SHOEMAKER," misapplied, embezzled, stole, converted and obtained by fraud hospital funds to benefit himself and his private company.

### Humphreys County Memorial Hospital

2.     At all times relevant to this indictment, Humphreys County, Mississippi was a local government, political subdivision of the State of Mississippi which received in excess of $10,000 in federal program benefits each year for the calendar years 2007 and 2008 as set forth in Title 18, United States Code, Section 666.

3.    Prior to April 30, 2008, Humphreys County Memorial Hospital (hereinafter "Humphreys County Hospital") was a county-owned, 34-bed, critical access hospital located in Belzoni, Mississippi, a small, rural community with a population of approximately 3,000 people. Humphreys County Hospital received in excess of $10,000 in federal program benefits each year in calendar years 2007 and 2008 and as such was an organization as set forth in Title 18, United States Code, Section 666.

4.    In January 2007, the defendant, RAY SHOEMAKER, through his company, Rural Healthcare Developers, entered into a management agreement with Humphreys County Hospital. The management agreement gave RAY SHOEMAKER full control of all hospital operations, subject to the authority of the hospital's board of trustees.

5.    SHOEMAKER continued as the sole manager of Humphreys County Hospital until April 30, 2008, when SHOEMAKER, through Rural Healthcare Developers, purchased the hospital from Humphreys County.

6.    From on or about January 2007 to on or about April 30, 2008, Humphreys County Hospital paid RAY SHOEMAKER, through Rural Healthcare Developers, approximately $1.7 million in management fees.

### Riverbirch Assisted Living / Sara Lou Properties

7.    At all times relevant to this indictment, an assisted living facility known as Riverbirch Assisted Living (hereinafter "Riverbirch") was located in Plantersville, Mississippi, approximately 160 miles away from Humphreys County Hospital in Belzoni, Mississippi, and the owners also operated a company under the name Sara Lou Properties, also located in Plantersville, Mississippi.

8.    From on or about March 2007 to on or about April 2008, Humphreys County

Hospital, under the direction of RAY SHOEMAKER, paid Riverbirch and/or Sara Lou Properties approximately $457,000.

## The Scheme

9.     From on or about January 2008 to on or about April 30, 2008, in the Northern District of Mississippi, defendant RAY SHOEMAKER used his position and influence as the manager and administrator of Humphreys County Hospital to intentionally misapply and knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to his own use, property valued at $5,000 or more owned by or under the care, custody, and control of Humphreys County Hospital, that is:

10.     From on or about January 2008 to on or about April 2008, RAY SHOEMAKER misappropriated and embezzled Humphreys County Hospital funds in order to pay approximately $39,922 to Riverbirch/Sara Lou Properties for construction work performed on a mobile home trailer SHOEMAKER owned in Ackerman, Choctaw County, Mississippi, approximately 100 miles away from Humphreys County Hospital. At SHOEMAKER'S direction, Riverbirch/Sara Lou Properties remodeled the mobile home and submitted the bills to Humphreys County Hospital for reimbursement. Shortly after RAY SHOEMAKER remodeled the mobile home in Ackerman, Mississippi with Humphreys County funds, he used it for his profit-making business with Choctaw County Medical Center, using the mobile home for the outpatient psychiatric services program for Choctaw County Medical Center, a separate and distinct hospital in Ackerman, Mississippi that did not have a relationship with Humphreys County Hospital. The construction work performed on the mobile home in Ackerman, Mississippi was for the personal benefit of RAY SHOEMAKER in his profit-making business with Choctaw County Medical Center, as further detailed below:

a.    On or about January 18, 2008, RAY SHOEMAKER, through Rural Healthcare Developers, entered into an agreement with Choctaw County Medical Center entitled "Partial/Intensive Outpatient Psychiatric Therapy Services Agreement" to establish and operate an outpatient psychiatric services program for Choctaw County Medical Center.

b.    On or about January 21, 2008, RAY SHOEMAKER, through Rural Healthcare Developers, entered into another agreement with Choctaw County Medical Center entitled "Inpatient Psychiatric Therapy Services Agreement" to establish and operate an inpatient psychiatric services program for Choctaw County Medical Center.

c.    On or about January 25, 2008, RAY SHOEMAKER, through Rural Healthcare Developers, purchased a mobile home trailer located near the Choctaw County Medical Center for approximately $32,650. RAY SHOEMAKER purchased the mobile home trailer for use as a clinical location for outpatient psychiatric services to be performed in connection with his "Partial/Intensive Outpatient Psychiatric Therapy Services Agreement" with Choctaw County Medical Center.

d.    From on or about January 25, 2008 to on or about March 24, 2008, RAY SHOEMAKER misappropriated and embezzled approximately $39,922.82 in Humphries County Hospital funds and used the embezzled funds to re-model and refurbish the mobile home trailer he purchased for use in the Choctaw County Medical Center's outpatient psychiatric program.

e.      On or about April 1, 2008, RAY SHOEMAKER, through Rural Healthcare Developers, entered into a management agreement with Choctaw County Medical Center and Nursing Home to manage all hospital operations for Choctaw County Medical Center.

f.      From on or about April 2008 to on or about September 2008, Choctaw County Medical Center paid RAY SHOEMAKER, by wire transfers, approximately $491,000 in fees under the three aforementioned contracts.

## 18 U.S.C. § 666

11.     From on or about January 2007 to on or about April 30, 2008, in the Northern District of Mississippi, the defendant, RAY SHOEMAKER, being an agent of an organization receiving in excess of $10,000 in Federal benefits in the calendar years of 2007 and 2008, that is, being the Administrator and Chief Executive Officer of Humphreys County Hospital in Belzoni, Mississippi, did knowingly and intentionally embezzle, steal, obtain by fraud and otherwise without authority knowingly convert to his own use property of Humphreys County Hospital and Humphreys County, Mississippi valued at $5,000 or more, to wit: approximately $39,922 owned and under the care custody and control of Humphreys County Hospital, all in violation of Title 18, United States Code, Section 666.

A TRUE BILL:

_/s/ Redacted Signature_____
F O R E P E R S O N

UNITED STATES ATTORNEY